Good morning, your honors. May it please the court, my name is Arthur Reed. I'm the attorney for Jesus Armenta. And I understand that we have 20 minutes between the four of us, so I'll be very brief. There's a single issue in this appeal, and that is the way I phrase it in the opening brief, the failure of the district court to address the argument that my client made through his attorney at sentencing that there was a perceived disparity between the district court's indicated 210-month sentence and what the government was recommending for various other co-defendants, for other defendants. And during sentencing, the lawyer developed that at some length. Didn't the district judge comment on it, though? Didn't the district judge say that the 1243 case was distinguishable or something along those lines? He said there were two different cases, and essentially that was all he said. In other words, he did address it in one sentence. What I'm saying is that it should have been more. And the only point that I think I need to make before this court is why that's important. What we have to keep in mind here is that this is a fairly serious case, in fact, a very serious case. It involves a huge drug cartel that was put out of business by the arrest of these 36 defendants. Now, as everyone knows who reads the newspaper, it's traditional that there are other drug cartels in Mexico that would make a mad dash to fill the void that is left by the arrest in this case. And so what I'm suggesting here in oral argument, which I did not mention in my brief, but I think it should be mentioned before this court, is that a very legitimate function of why we're here today is to send a message to those people down in Mexico as to what happens here in the United States. Now, the problem is that they may get the wrong idea about that. When you look at the transcript of the sentencing in this case, where the lawyer for my client says that there was another defendant who had a criminal history of Category 3, but the plea agreement reduced that to a 2. And so even though it was a 3, it became a 2 at the time of sentencing. And I'm referring to Page. With the disparity you're arguing, you're arguing the disparity in the 1242 case, Munoz and Romero, but I'm questioning whether there's even a disparity because Munoz cooperated and Romero, I think he had less drug quantity. And so are those what you're complaining about as the people who were sentenced to disparity? Yes, Your Honor. That's exactly what I'm complaining about. But is your client in the same position as those two defendants? Yes, Your Honor. He was part of the same overall conspiracy. And I say that in my reply brief, that there was just one conspiracy. And so, therefore, the judge was wrong, in my opinion, when he said, well, we're talking about apples and oranges here, that he really can't be compared with these other defendants. What I'm saying is that he can be and that he should be so that other people who would be deterred from this type of conduct would know why there's a difference in sentencing. Because if some people made an agreement to cooperate with the government, naturally that would reduce their sentence. What I'm saying here, and then I'll end my argument, is simply that that should have been addressed during the sentencing proceedings so that there isn't what the military refers to as an appearance of evil. In other words, there's an appearance when suddenly a three-level criminal history becomes a two-level that maybe something is going on behind the scenes when we know that it isn't. Mr. Weed, my guess is that your deal is for five minutes. Okay. That's correct. I'm just giving you a heads-up. If the Court has no questions, I will sit down. Thank you, Your Honor. Okay. Good morning. I'm John Casarillas, and I'm arguing on behalf of Juvenal-Vegas Soto. And the issue I'm addressing is that Mr. Vegas Soto's position is that the doctrine of speciality or is referred to in the extradition treaty between the United States and Mexico in Article 17, Section 2, the rule of speciality was violated in the manner in which he was extradited here to the United States. Can you just in really simple words explain to me why when you say the maximum exposure is a life sentence, that doesn't cover the base? That was going to be the next sentence out of my mouth, Your Honor. The essential issue before the Court is whether life without release, which is what Mr. Vegas Soto was prosecuted under under 851, the enhancement that was filed, is a more severe sentence than the life potential sentence that he was extradited under. Well, if the government had told Mexico the maximum exposure is a life sentence with the possibility of parole, then I understand. What I don't understand is when Mexico is told there's a life sentence, I mean, excuse me, a life imprisonment, is the maximum penalty. Well, that is. Well, Mexico was told, if the Court looks at excerpt of the record, page 38, what Mexico specifically was told was that there is a potential sentence in this case of 10 years to life. At 841, an excerpt from the statute was sent to Mexico. Which is precisely what he got, life. Well, I think that the rest of the section that was quoted was that the maximum fine is potentially $4 million, and there's a potential release of, supervised release of up to five years. And then another section quotes that he could get 20 to life. What's interestingly not as edited out of the statute is what happens to someone with prior offenses, which is that you get life without release, and that's what the rest of the section says. But what does that mean substantively? I mean, how is that substantively different than life imprisonment? Because Mexico is not told that life, the potential of life, de facto under the federal system means life without parole today, nor is it told that this man has priors, nor is it told that an 851 enhancement is contemplated. So I think any reasonable person reading that statute, noting the range of sentences that's available, the discretion that's available, and the fact that supervised release is available, would infer that this is a normal life sentence, i.e., one with the potential of parole. And why I think that's important is because our law recognizes that life without release is a more severe penalty than life with parole. And that's why we have 851. The purpose, as stated in the case law that's before the Court in the briefs for 851, is to notify the defendant of the potential consequence of a life without release sentence so that he or she knows if he or she pleads guilty or is convicted, there's a different consequence, and to give that person an opportunity to challenge the priors. So what do we make of the fact that the written judgment says simply life imprisonment and not life imprisonment without release? I think my memory is that Judge Subraw sentenced in two manners, one, under 851, life without release, and second, he sentenced under 841A1, a life sentence. And I think he sentenced in two manners because of this issue before the Court. And I think that our law recognizes throughout the law that life without release is different than life with release. That's why we file special circumstances in State court in many States in this country when a death sentence is sought. There are kind of a triad of potential sentences. Is there a vehicle for Mexico to express its views? I mean, that is, given the government's representation about the sentencing options in this case, Mexico, I take it, could have said, no, we're not going for this if it's life in prison without the possibility of parole. Or clarify what you're talking about when you say 20 to life imprisonment. Could Mexico have done that? Well, I suppose Mexico could have done that, but I think that the law is clear that Mr. Vega Soto is in the same shoes as Mexico today to raise whatever objections Mexico could raise today. I.e., that it was misled by the way the statute was stated to it. Well, I would suppose Mexico is capable of saying that for itself if it cares. I mean, it's probably delighted. Well, Mr. Vega Soto has the opportunity, has the same standing as Mexico under the Cuevas case, which is quoted to the Court, to raise anything that Mexico could raise as a violation of the treaty. Yes, but when is the time to do that, I guess, is my point. I think that the way to do that is to make a judgment, because Mexico has to make a judgment call about whether to extradite or not, and so it does. Well, it extradited and then after Mr. Vega Soto's case, there was a range of sentences quoted to Mexico. And I think a reasonable person reading that range would infer this is a normal life sentence. He could get probation. He could get up to supervised release. He could get a whole range of discretions that the sentencing court will have. There's no reason to believe that Mexico would understand that 851 is an option. It's not told that. Mexico is not told that life de facto under the federal system, at least today, does not involve parole. And Mexico is not told that we are contemplating filing the 851 because there's these prior offenses. It's not even told that Mr. Vega Soto has these prior offenses. And that's interestingly, that part of the statute and his prior offenses are interestingly not informed to Mexico so they can make that judgment. So in my view, I think that the 851 sentence should enhance, pursuant to the enhancement, should be stricken and the remaining sentence should be left under 841A1. So were there two written judgments? Because I just have one. My memory, Your Honor, I haven't looked in the what's before the court, but my memory was that Judge Subraw sentenced in a dual manner, one under 841A1 and then under 851 with the enhancement. Right. I just seem to have only one judgment in my excerpts. So there were two written judgments. I recall him stating that at the time of sentencing. Okay. So he said that at the time of sentencing and orally in the transcript, but I only find one judgment, and that just says life imprisonment. Is that pursuant to 851, Your Honor? No, no. That's 841. But I don't see an 851 judgment is what I'm trying to say. I haven't checked that. I just recall orally him stating that he was. I know he did orally, but what I'm asking you about is, is there a second written judgment specifically under 851? I can't answer that today. I don't know that. I just recall what he stated at the time of sentencing. Okay. I would imagine it's time for your colleagues. Thank you. Good morning, Your Honor. David Zugman on behalf of Martin and Frank Reyes with respect to the Sixth Amendment issue. Mr. Colombo is going to help handle the wiretap issue, although we recognize that that has taken some serious shots under recent case law, and Mr. Colombo won't argue it unless Your Honors have particular questions. And I'm, of course, excited to discuss the recent changes in case law with respect to the Sixth Amendment. I have an argument that I've been bringing, most notably the Treadwell case. I was counsel for Defendant No. 2 on that, Ricky Sluder, so I'm intimately familiar with that case. And there are, just like the Reyes case, I raised both the Rita-style argument as well as the parsimony argument. The parsimony argument did not make it into the written Treadwell opinion. I don't know why that is. I'm sure when I file my petition for re-hearing, something will happen perhaps. But I wanted to explain. This is one of my few chances to try to explicate the argument because I'm clearly not getting it across. The position of the government and the position of many district courts prior to Booker was that the only maximum that mattered for Sixth Amendment purposes was the statutory maximum. That's the refrain we get in the cases. The only way you can violate it is if you get a sentence in excess of the statutory maximum. Now, we know that that's not true. It would be per force of the substantive Booker opinion because, of course, the guidelines themselves, when they were mandatory in their mostly mandatory sentence, of course, you could depart from them under certain circumstances, created a different legal entitlement to a sentence. If a judge sentenced not within the range, the judge would get reversed. So the guideline calculation was important to the lawfulness of the sentence. And it's odd that now the guidelines' importance have been moved to appeal. So when a district court judge calculates a guideline range and then sentences, I concede there is no Sixth Amendment violation at that point because the judge does not require the judge to give that sentence without calculating the guideline range. You know, it would be reversed under Cardi, but you'd go calculate it and then theoretically impose the same sentence. But when this court performs substantive reasonableness review, the only thing your honors have to compare the judge's reasonableness of the sentence to your touchstone is the guideline range. You don't have anything else. You have never seen the defendants in this case. You do not you couldn't hear them allocute. You can't make those sort of factual findings. The only touchstone you have is the guideline range. So you have the district court's findings on 3553A factors. Oh, correct. But you would your review of the 355A factors is only for whether they exist or not, right? Oh, I think our review treats the 3553A and the guidelines all in the same pot, and we're reviewing the sentence that was actually imposed for substantive reasonableness. I might humbly disagree that the Court has been a unitary voice. I will party. Well, a unitary voice. Isn't that what I said? With respect to how reasonableness review is performed, like there is a big fissure in this Court about how you look at the 3553A factors and how do you perform that task of saying, well, how is a sentence disparate? I mean, respectfully, unless you're in the district courts every day, it's hard to get a real sense for what a case is getting, what the average sentence is because most cases are resolved by plea with no appeal. Your honors never see them unless and until a habeas is filed and even then. So the guideline range being very important, that's the RETA argument. That's going to be part of the Treadwell petition for rehearing. The parsimony argument, though, I really think has some teeth. The parsimony provision I believe was never intended to perform this role, but it was put into 3553A, and it says that the Court shall impose the parsimonious sentence, meaning the least onerous sentence under the circumstances, and that the parsimonious sentence is going to be different depending on whether there are guideline findings or not. So if guideline findings are raising the parsimonious sentence, then they are performing the exact same function that they did. I apparently have lost you, Your Honor. Okay. So Judge ---- You're losing me only because of the point I just made a minute ago. We're not making two different determinations. We're only looking at the bottom line. And we're saying, is that sentence reasonable? If the judge did not commit procedural error, that is, he reasonably calculated the guideline range and he considered all of the relevant 3553A factors, then is the bottom line reasonable? The most recent case, of course, the Bomber case with the 22-year sentence, Judge Bea's extensive concurrence, I believe. Well, yes, but that's a sui generis case having to do with Rassam. I mean, I don't think that changes the basic ---- The law is not sui generis, though. The law, the principle that I'm arguing does not change based on who the defendant  I mean, the fact is, is if you look at just what the jury found and you say that there is one sentence that would be applicable under the parsimony clause, and then the judge makes factual findings that changes that parsimony sentence, there is no logical way to say that those findings have not elevated the parsimony sentence. And if Apprendi really is about effects rather than form, then I don't see how there's a logical distinction. Well, I understand. I understand your argument. I think Justice Scalia understands your argument. It doesn't matter, I'm sure. And he's still in the minority, though, on the Supreme Court in pushing Apprendi to that point. Maybe he'll get there and get the majority at some point, but that's not the law now. So you're asking ---- in fact, it seems like it's foreclosed now by Treadwell, although I understand you're saying it's not. Treadwell is still going. Yeah. Well, that's true. I mean, obviously, it's always the case. But the answer has to be more than just that this argument is clever. I mean, it has to be that I'm wrong in some premise or I'm wrong about the premise. But it is clever. Oh, thank you. Well, I'm not the author of it. I just, you know, a good thief is worth ten hours. It's a good argument, and it logically flows from Apprendi in all these cases. But, you know, I ---- my view of all this is that it's all been somewhat nonsensical, because all we've done is just gone back to pre-guidelines, because, you know, we might as well not have them, except for we tried to save them to save face and give the sentencing commission work. But I just think it's now back to almost anything. Yeah. It's your creation becoming the abomination. But I can't end on anything better than that, so I'll reserve the rest. Okay. Anthony? May it please the Court. Anthony Colombo on behalf of Martin Reyes, the defendant appellant. I was prepared to submit, and I will just make this brief statement to the Court, and I reserve the additional time for rebuttal. My chief complaint about the wiretap application is that it did not include a full and complete statement of facts necessary under 25181C. And my chief complaint is that in this case there were five particular confidential sources or informants that were very prolific pre-application for the wiretap, and then all of a sudden they just were not cooperative, were fugitives, and were no longer around. I think in this particular case, in order to provide a full and complete statement of facts, it would have to include the motivation of the cooperating informants, the benefits that they received from the government in exchange for the cooperation, and then finally why, before the wiretap application was submitted, that they're no longer cooperative. They no longer want to cooperate. And I think this is important for this reason, because if these confidential informants are receiving benefits in exchange for the information that they're providing, and then all of a sudden the government then withdraws these benefits, and then they're no longer interested in providing information, they are manufacturing necessity. They are manufacturing the necessity for the wiretap application. And that is something that should be included in the application to provide a full and complete statement of facts. And with that, unless there's any questions, I would submit. Okay, thank you very much. Now I hear from Mr. Robinson. Good morning, Your Honor. Todd Robinson on behalf of the United States. What I'd like to do is address the arguments raised in the order in which they were raised by my colleagues representing the appellants in this case, starting first with the sentencing disparity argument being raised by Mr. Armenta. That argument was addressed by the district court sufficiently at the time of sentencing. Specifically, it was not raised in any of the defendant's sentencing papers. Rather, it was raised in an oral fashion at the time of sentencing. And specifically, four people were brought to the attention of the district court. And those individuals were Raul Leon, who was the lead defendant in the 1243 case. There was also Robert Romero, who was both charged in the 1242 case, the case in which these defendants were involved, and the 1243 case. He pled guilty in the 1243 racketeering conspiracy case and not the 1242 case. So we have two defendants that were brought to the district court's attention who had nothing to do with the charged conspiracy in which Mr. Armenta was a participant. The third was Jesse Munoz, who was addressed at the district court level as someone who had cooperated with the government and therefore was going to receive a markedly different type of sentence, notwithstanding his involvement in the offensive conviction. So that was the only person who had pled guilty to the 1242, the exact same conspiracy. The last person raised to the district court was Dimitri Contreras, who was not even charged in the 1242 case, the methamphetamine distribution conspiracy, and was only charged in the 1243 racketeering conspiracy. And most telling is that Dimitri Contreras' only involvement in the racketeering offense was the taxation of drug traffickers on behalf of the Mexican mafia. So to juxtapose Mr. Armenta, who the district court found had imported and distributed 39 pounds of methamphetamine, was someone who pled guilty to a racketeering conspiracy whose involvement in that racketeering conspiracy was the taxation of drug dealers on behalf of the Mexican mafia, really underscores the inappropriateness of the analysis which was asked of the district court at the time of the sentencing by Mr. Armenta. Was it known at the time of that sentencing that Munoz was cooperating with the government? Because I'm just wondering whether that's something that, I mean, at the time was under seal or what was going on with that? No, Your Honor, it brings up a very interesting point because the investigation in this case led to six separate indicted cases. The trial of Vega Soto and his two co-defendants, the Reyes brothers, was the last of the cases which went to trial. So at the time of this sentencing, the district court had sighted through two other trials in related cases. And the first trial, one which has been affirmed on appeal already, Munoz testified in that case. And so it was well known that he was a cooperating individual. And most tellingly, in the 1243 case, the district court had sat through almost four months of trial when the seven defendants proceeded to trial in that case. So when this case came before the district court for sentencing and Defendant Armenta is raising these other individuals involved in a separate case and a separate offense, and the district court distinguished those people from Mr. Armenta, that was all he could do at that point. He said, what you're asking me to do is compare apples with oranges in terms of the appropriateness of the sentence, that is the tentative 210-month sentence that he indicated was his belief as the appropriate sentence under 3553A. So it was in a sentence or two where the court said, you're asking me to compare not similarly situated individuals, but that's all the district court could have done at that juncture. Moreover, three out of the four people that were brought to his attention hadn't even been sentenced yet. So the court was being asked to speculate what their sentence might be in the future and then resolve a disparity argument that really made no sense given the posture of the case. And in reviewing the reasonableness of the sentence that was imposed on Armenta as this court is being asked to do, he received a 210-month sentence. The other three people involved in the discrete 12-pound methamphetamine transaction, as this court is well aware, is Vega Soto, who received a life sentence, Martin Reyes, who received a 260-month sentence, and Frank Reyes, who, like Armenta, had no prior criminal history, received a 210-month sentence. So when viewing the sentence that was imposed on Armenta with the similarly situated defendants, who were involved in the exact same conspiracy to which he pled guilty, his sentence is at the low end of what people received in that case and is therefore unquestionably reasonable under the circumstances. And I can go into more of the guideline calculations that were made by the district court, but he was not given a plus three for the supervisory role over his mother. He had his mother strap the methamphetamine to her person such that when she was pulled out of the car at the traffic stop in connection with the 12-pound delivery, she had a hump of methamphetamine. This is a woman who was a schoolteacher in Tijuana, Mexico, who was recruited by her son to participate in this conspiracy involving the importation of significant quantities of methamphetamine. And the district court, in its discretion under 3553A, and in its guideline calculations, did not give him plus three. That further underscores the substantive reasonableness of the sentence that was imposed on defendant Armenta. Turning to the second argument that's being made by Vega Soto as to the extradition of Vega Soto and the representations that were made to the government of Mexico in connection with that particular extradition request, I think he misses an important point when he argues the rule of speciality to this court and the court having the ability to review the case as it stands at this juncture. The rule of speciality does not apply to his claim. The issue that he raises before this court has nothing to do with the rule of speciality. The rule of speciality requires two things. It requires that the individual who is extradited be tried for the very same offense for which he was extradited, which admittedly occurred in this case. And the second is the requirement that there be dual criminality. That is, the offense here in the United States must have a mere offense provision in the country for which extradition is being sought, from which extradition is being sought, in this case Mexico. Again, there is no claim that the dual criminality aspect of the rule of speciality did not exist. So what Vega Soto is actually asking this court to do is to create a whole new cognizable remedy based on the request that was made to the Republic of Mexico. And that fails for two reasons. First, Mexico was informed that the maximum penalty faced by Vega Soto was life. The district court's judgment and commitment order sentences him to a term of life. Okay. Is there a second one? There is not. Okay. Because that's what the written judgment obviously takes precedence over what he said in the oral transcript, unless someone brings it to his attention and says there's a discrepancy and you've got to change the written judgment. Yes, Your Honor. My colleague, Mr. Cotreles, was correct that the district court found in the alternative, based on the guideline sentence that was being faced by Mr. Vega Soto and his criminal history category, he was facing a guideline sentence of life. The government, by filing notice pursuant to 851 of his two prior felony convictions, all that did in effect was divest any sort of discretion from the district court in what sentence to apply and mandated a life sentence. There is no difference between a guideline life sentence and a life sentence under 841B1A once two 851 notices have been filed. There is no difference. Mr. Cotreles argued to this court that there's some kind of quantitative difference between a life sentence and a life sentence with the possibility of parole. That may well be true. If we were in state court and the sentence was life with the possibility of parole, that's fine. But under the Sentencing Reform Act, there is no such thing as parole. And that's why District Court Judge Sobraw, in issuing the judgment and commitment order in this case, sentenced him to life. He didn't have to put in the judgment and commitment that it was life without the possibility of parole. Any life sentence. The other nine defendants in the related cases who received life sentences also got life sentences without the possibility of parole. There simply is no difference between a life sentence and a life sentence without the possibility of parole as required when sentencing pursuant to 851 enhancements under 841B1A. So there really is no distinction. But I respectfully submit that the court need not even reach that issue because to the extent that there was any misrepresentation in the extradition request, and I do not concede that there was any misrepresentation, it is a matter between the Republic of Mexico and the United States government. I would refer the court to the Alvarez-Machin line of cases where that person, in that case, the defendant was kidnapped and brought in contravention of the treaty, and there was no remedy for that defendant. The body could not be suppressed. The remedy in that case was for the two sovereigns involved in the case to work it out amongst themselves. So to the extent that there was any deficiency, which there was not, but even if there were, it would be an issue for the two sovereigns involved in this extradition to work out amongst themselves. Certainly not a judicially cognizable claim on appeal, particularly when the rule of speciality has nothing to do with the claim that's being urged upon this court. To the Sixth Amendment issue, I would respectfully submit that the Treadwell case that was recently published on January the 28th forecloses the claim that's being made. The inquiry really, with respect to any sentence under the recent state of the law, is whether or not that sentence is reasonable. And what Judge Subraw did with respect to both Frank Reyes and Martin Reyes, the two who make the Sixth Amendment-related claim and the rule of parsimony claim, is telling. Frank Reyes' guideline range was life, as calculated by the probation office. Martin Reyes' guideline range was 360 to life. The government urged the court to depart beneath those guideline ranges for both of those defendants under 3553A, and having sat through the numerous trials that stem from this investigation, the district court did just that and sentenced Frank Reyes to 210 months and Martin Reyes to 260 months, which was well below the low end of the guideline range as calculated by the probation office. The district court dutifully discharged its obligation under 3553A to make fact findings, to view each defendant individually. He assessed their participation in the conspiracy, their role in the offense, their criminal history, the way in which they addressed the court at the time of sentencing, and whether or not their candor was something that the court deemed honest remorse for what they had done, or whether or not they were someone as Martin Reyes who refused to accept responsibility for his participation in the conspiracy, despite the overwhelming evidence that pointed to his involvement in the conspiracy. The district court did what it was obligated to do and fashioned a just, fair, and reasonable sentence, and in doing so, specifically stated, I'm imposing the least amount of time necessary to comply with 3553A. The district court made that specific finding of fact when imposing the sentences in this case. With respect to the necessity argument that's being made, I take issue with the contention that somehow in seeking the wiretaps in this case, the government did something to create necessity. The four corners of the affidavit speak otherwise. There were five informants that were utilized during the nine-month investigation, which led up to the time at which the government sought authorization to conduct a wiretap on Munoz's phone. This was not a situation where the government rushed headlong into this investigation and as a matter of first recourse, sought and obtained authorization to tap a wire, to conduct a wiretap on telephone, which is what the Blackman case and the other cases cited by defense counsel speak to. What the government did was it went through all of the available traditional investigative techniques. It recounted each and every one of those traditional investigative techniques to the district court and thereby complied a full and complete statement of those facts, and I respectfully submit to this court that the district court, in finding necessity to conduct the wiretaps, did not abuse its discretion, which is the standard of review for that finding by the district court. Speaking specifically to the informants in this case, informants number 1, 2, and 3, CS1, 2, and 3, as noted in the affidavit, were incarcerated. Their status and their ability to further the goals of the investigation was addressed. Someone who is in custody cannot continue, as CS1's role was, to purchase narcotics from targets of the investigation. Now, defense counsel has stopped short of saying that somehow the government manufactured their arrests, which is not the case. There's nothing in the record to suggest that. The other two remaining informants in this case, CS4 and CS5, were fugitives. And again, defense counsel stopped short of accusing the government of burying its head in the sand and trying not to find these people, but that's not the case. There's nothing in the record to support that contention. And the government is taken to task in a Monday morning quarterback type argument that somehow the motivation of each one of the informants for providing the information is fatal to the affidavit, that somehow by not including that information in the affidavit, the government presented the district court with something less than a full and complete statement of facts. The contrary is true. The only informant who was involved in establishing probable cause to conduct the intercept was CS1. CS1, hypothetically speaking, could have been a pathological liar who had been promised a million dollar reward by the government. Those facts, even if they were omitted from the affidavit, would have no bearing on the probable cause that was demonstrated. The four purchases CS1 made from Munoz were all tape recorded. They were monitored by law enforcement personnel. And the only thing his information did was provide probable cause to believe that Munoz's telephone, target telephone number one, was being used to facilitate the commission of the narcotics conspiracy being investigated. That was proven to the district court in the affidavit beyond any doubt whatsoever. The credibility of CS1 was not at issue. And therefore, CS1's motivation, assuming that not including that information was somehow an infirmity of the affidavit, which of course I do not concede is true, was irrelevant to the court's probable cause determination with respect to that telephone facility. The affidavit in this case went through the confidential informants, the search locations, the pen register data, the ability to introduce an undercover into the operation, and the other traditional investigative techniques that are ordinarily available to the government. Those techniques were adequately described if they had been used. And to the extent that those techniques were not available, such as surveillance of Juvenal Vega Soto, who was living and operating in Tijuana, Mexico, where U.S. law enforcement cannot go and participate in the investigation, or surveillance at Munoz's residence, the fact of the matter is, the affidavit in this case was tailored specifically to this investigation. It did not include boilerplate language which could be used in any drug trafficking investigation without specific reference to the facts and circumstances of this case. 2518 requires no more. And with that, Your Honor, I would submit. Thank you. Unless there are any questions. Thank you, Mr. Richardson. Thank you. Anybody feel obliged to? No, Your Honor. Unless the Court has to. Very briefly, Your Honor. John Castros, again, on behalf of Juvenal Vega Soto. Your Honor, just two points. One, in the Cuevas case that's cited in the papers before this Court at page 1426, this Court specifically held that an extradited person may raise whatever objections the extradited country could raise, and I think that should be clear. And second, I disagree that the rule of speciality, it's called the doctrine of speciality in the case law, but specifically it's called the rule of speciality in the treaty between the United States and Mexico. It specifically is defined in Article 17, Section 2 of that treaty, as being a classification of offense involves a prosecution for the same facts as those that the person was extradited for and a prosecution with no greater maximum sentence. And that's our point, is that a more severe sentence was sought, and a diplomatic note, at the very least, as occurred in much of the case law before the Court should have been sent to Mexico informing them of that. Thank you. Thank you. Anything further? All right. Thank you, counsel, all of you, for your argument. The matter just argued will be submitted, and the court will stand in recess for today. All right. Thank you.
judges: Kennelly, Rymer, Wardlaw